IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

COMMONWEALTH OF VIRGINIA     )
                                  )
       v.                     )     Case No. 1:21-cr-00092-CMH
                                    )
LUCAS VINYARD                 )

## **COMMONWEALTH'S OPPOSITION TO MOTION TO DISMISS**

Mark R. Herring (VSB No. 31718)
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Steve T. Descano (VSB No. 89881)
  *Commonwealth's Attorney for Fairfax*
  *County*

Kyle Manikas (VSB No. 71234)
  *Chief Deputy Commonwealth's Attorney*

Matthew B. Lowery (VSB No. 41662)
  *Deputy Commonwealth's Attorney*

Michelle S. Kallen (VSB No. 93286)
  *Acting Solicitor General*

Kendall T. Burchard (VSB No. 95710)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

INDEX OF EXHIBITS .................................................................................................... v

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 1

   I.   Factual Background ........................................................................................... 1

   II.  Procedural Background...................................................................................... 8

LEGAL STANDARD....................................................................................................... 9

ARGUMENT ................................................................................................................... 10

   I.   Vinyard is not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that Vinyard's actions were not authorized by federal law...................... 12

        A.  Vinyard's actions were inconsistent with federal law and Park Police policy.......... 12

        B.  Vinyard's authority did not extend to violations of the Constitution and to actions taken with criminal intent .......................................................................... 18

   II.  Vinyard is not immune because he failed to eliminate any genuine dispute that, in pursuing and killing Ghaisar, his actions were no more than necessary and proper in performing his federal duties............................................................................................. 22

        A.  Vinyard's actions exceeded what was necessary and proper .................................. 23

        B.  A reasonable trier of fact could disagree with Vinyard's unsupported suggestion that he had a subjective belief that Ghaisar posed a risk to officers or the public .......... 24

        C.  Even if Vinyard subjectively believed his actions were justified, a reasonable trier of fact could find that belief objectively unreasonable .................................... 25

CONCLUSION................................................................................................................. 29

CERTIFICATE OF SERVICE ........................................................................................ 30

# TABLE OF AUTHORITIES

Page

**Cases**

*Anderson v. Creighton,*
483 U.S. 635 (1987) ................................................................................................ 26

*Arizona v. Files,*
36 F. Supp. 3d 873 (D. Ariz. 2014) ..................................................................... 25

*Arizona v. Manypenny,*
451 U.S. 232 (1981) ................................................................................................ 11

*Birsch v. Tumbleson,*
31 F.2d 811 (4th Cir. 1929) ............................................................................ 10, 22

*Cunningham v. Neagle,*
135 U.S. 1 (1890) ........................................................................................... passim

*Denson v. United States,*
574 F.3d 1318 (11th Cir. 2009) ............................................................................ 18

*Drummond ex rel. Drummond v. Anaheim,*
343 F.3d 1052 (9th Cir. 2003) ............................................................................. 26

*Ging v. Ging,*
18 Neb. App. 145, 775 N.W.2d 479 (2009) ....................................................... 25

*Graham v. Connor,*
490 U.S. 386 (1989) ................................................................................................ 19

*Gutierrez v. San Antonio,*
139 F.3d 441 (5th Cir. 1998) ............................................................................... 26

*Harlow v. Fitzgerald,*
457 U.S. 800 (1982) ................................................................................................ 22

*Harris v. Pittman,*
927 F.3d 266 (4th Cir. 2019),
  *cert. denied,* 140 S. Ct. 1550 (2020) ................................................................. 19

*Idaho v. Horiuchi,*
253 F.3d 359 (9th Cir. 2001),
  *vacated as moot,* 266 F.3d 979 (9th Cir. 2001) ........................................ passim

*In re Fair,*
100 F.149 (C.C.D. Neb. 1900) ............................................................................. 20

*Isaac v. Googe,*
284 F. 269 (5th Cir. 1922) .............................................................................. 12, 18

*Kentucky v. Long,*
837 F.2d 727 (6th Cir. 1988) ................................................................................. 9

*Martin v. Broadview Heights*,
 712 F.3d 951 (6th Cir. 2013) ................................................................ 26

*Martin v. Cavalier Hotel Corp.*,
 48 F.3d 1343 (4th Cir. 1995) ............................................................ 19, 25

*Maryland v. DeShields*,
 829 F.2d 1121 (4th Cir. 1987) ........................................................... 18, 20

*McCulloch v. Maryland*,
 17 U.S. 316 (1819)............................................................................ 10, 11

*Morgan v. California*,
 743 F.2d 728 (9th Cir. 1984) ........................................................... 11, 22

*New York v. Tanella*,
 374 F.3d 141 (2d Cir. 2004) ......................................................... passim

*Petition of McShane*,
 235 F. Supp. 262 (N.D. Miss. 1964)................................................ 12, 25

*S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*,
 690 F.2d 1235 (9th Cir. 1982) ................................................................ 25

*Screws v. United States*,
 325 U.S. 91 (1945)..................................................................................... 8

*Sotnikau v. Lynch*,
 846 F.3d 731 (4th Cir. 2017) ................................................................ 21

*State v. Ivory*,
 906 F.2d 999 (4th Cir. 1990) ................................................................ 11

*Tennessee v. Garner*,
 471 U.S. 1 (1985)..................................................................................... 20

*Texas v. Kleinert*,
 855 F.3d 305 (5th Cir. 2017),
 *cert denied* 138 S. Ct. 642 (2018) ................................................... 22, 25

*United States ex rel. Drury v. Lewis*,
 200 U.S. 1 (1906) ........................................................................ 10, 11, 18

*United States ex rel. Touhy v. Ragen*,
 340 U.S. 462 (1951)................................................................................... 8

*United States ex rel. Bradshaw v. Alldredge*,
 432 F.2d 1248 (3d Cir. 1970) ........................................................... 19, 25

*United States v. Allen*,
 No. 17-po-7135, 2018 WL 1035770 (D. Md. Feb. 23, 2018)................. 15

*United States v. Hernandez-Ayala*,
 No. 16-po-4622, 2017 WL 2666243 (D. Md. June 21, 2017) ................ 15

*United States v. Jones*,
 428 F. Supp. 2d 497 (W.D. Va. 2006) ................................................... 15

*United States v. LaFountain*,
No. 12-po-6164, 2013 WL 391153 (D. Mass. Jan. 29, 2013) ................................ 15

*United States v. Weaver*,
659 F.3d 353 (4th Cir. 2011) ........................................................................... 9, 28

*Weigel v. Broad*,
544 F.3d 1143 (10th Cir. 2008) ............................................................................. 26

*Williams v. Strickland*,
917 F.3d 763 (4th Cir. 2019) ................................................................................. 20

*Wyoming v. Livingston*,
443 F.3d 1211 (10th Cir. 2006) ..................................................................... 22, 28

**Statutory Authorities**

16 U.S.C. § 1a-6(b) (2014) .......................................................................................... 16

18 U.S.C. § 242 ............................................................................................................... 9

28 U.S.C. § 1455 ............................................................................................................. 9

54 U.S.C. § 102701 ............................................................................................... passim

Va. Code Ann. § 18.2-36 ......................................................................................... 9, 22

Va. Code Ann. § 18.2-56.1 ...................................................................................... 9, 22

Va. Code Ann. § 19.2-12 ............................................................................................. 17

Va. Code Ann. § 19.2-18 ............................................................................................. 17

Va. Code Ann. § 19.2-79 ........................................................................... 6, 14, 17, 19

Va. Code Ann. § 19.2-81 ............................................................................................. 17

Va. Code Ann. § 46.2-894 ................................................................................... passim

**Other Authorities**

Mathew Bender & Company, Inc., Virginia Model Jury Instructions – Civil: Release 20, March
2020, Instruction No. 4.040 .............................................................................. 22

U.S. Park Pol. Gen. Or. 2101 ........................................................................................ 3

U.S. Park Pol. Gen. Or. 2205 .............................................................................. passim

U.S. Park Pol. Gen. Or. 2210 .............................................................................. passim

U.S. Park Pol. Gen. Or. 3601 ........................................................................................ 5

U.S. Park Pol. Gen. Or. 3615 ............................................................................... 18, 19

## INDEX OF EXHIBITS

Exhibit A:      Federal Law Enforcement Training Center Transcript of Lucas Vinyard

Exhibit B:      United States Park Police Internal Affairs August 2012 Report

Exhibit C:      United States Park Police Office of Professional Responsibility August 2013 Report

Exhibit D:      Vinyard Qualification Cards

Exhibit E:      E-mail from Deputy Chief Gregory T. Monahan, United States Park Police, to Agent Giulio Arseni (January 10, 2018, 1:10 p.m.)

Exhibit F:      Dep't. of Interior Investigator's Traffic Crash Report

Exhibit G:      Interview with Atif Rehman

Exhibit H:      Federal Law Enforcement Training Center Training Directorate

Exhibit I:      United States Park Police General Order 3601 (Firearms)

Exhibit J:      United States Park Police General Order 2210 (Roadblocks)

Exhibit K:      Federal Bureau of Investigation Laboratory Report

Exhibit L:      Medical Examiner Report

Exhibit M:      Expert Report of Dr. Christopher Chapman

Exhibit N:      Summary Presentation (submitted to the Court on a separate disk)

## INTRODUCTION

"We have grown accustomed to relying on the federal government to protect our liberties against the excesses of state law enforcement." *Idaho v. Horiuchi*, 253 F.3d 359, 361 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001). But when federal law enforcement exceed their authority, state prosecutions "provide an avenue of redress on the flip side of the federalism coin." *Id.* at 361–62. Federal officers who violate our rights, "either through malice or excessive zeal, [] can be held accountable for violating [a] state's criminal laws." *Id.*

At the same time, the Supreme Court has recognized that in the exceptional circumstance where a state prosecution unduly constrains the operations of the federal government, the Supremacy Clause may immunize a federal official from state prosecution. This case is not one of those "exceptional" cases that justify interference with the "regular course of justice in the state court" by the grant of immunity from state prosecution. *Baker v. Grice*, 169 U.S. 284, 291 (1898). Far from limiting the doctrine to the "exceptional" case, Vinyard asks this Court—relying on almost no evidence—to substantially expand its scope far beyond its purpose.

## BACKGROUND

On November 17, 2017, Lucas Vinyard and his fellow United States Park Police officer, Alejandro Amaya, shot and killed 25-year-old Bijan Ghaisar in a residential neighborhood in Virginia. The officers' actions were inconsistent with their training and with the law.

I.   **Factual Background**

A.       **The United States Park Police**

The United States Park Police is a division of the National Park Service within the Department of the Interior. Established by George Washington in 1791 to protect federal property in Washington, D.C., the Park Police still operates as the principal law enforcement

authority in federal parks—such as the National Mall or the Golden Gate National Recreation Area—and over other federal property, including the George Washington Memorial Parkway.

The Park Police's statutory authorization to "maintain law and order and protect individuals and property within [National Park] System units" is limited by applicable law and Park Police General Orders. 54 U.S.C. § 102701(a)(1). Although officers may "carry firearms," "conduct investigations," and "make arrests without warrant," these powers are confined to certain circumstances in specific locations.[1] 54 U.S.C. § 102701(a)(2). Similarly, Park Police General Orders establish and define the boundaries of officers' authority. For example, General Order 2205 specifies the narrow circumstances under which vehicular pursuits are permitted, and General Order 2101 confines when and where an officer may conduct arrests. See USPP Gen. Ors. 2205 (ECF #12-1, Ex. 1) & 2101 (ECF #12-1, Ex. 2). These orders, combined with pertinent state and federal law, constrain the Park Police's power.

B.      Officer Lucas Vinyard

Vinyard began his career with the United States Park Police in 2008, after completing a four-month training course at the Federal Law Enforcement Training Center in Glynco, Georgia. See Federal Law Enforcement Training Center Transcript of Lucas Vinyard (Vinyard Transcript) (Ex. A); Vinyard Br. 3 (ECF #12). There, Vinyard received "satisfactory" marks in emergency response driving, defensive tactics, and arrest techniques, among other classes. Vinyard Transcript at 1. Following graduation, Vinyard was assigned to the midnight patrol in District One of Washington, D.C. In March 2010, he started on the dayshift in District Two, which encompasses the George Washington Memorial Parkway. Vinyard was reassigned three years

---

[1] These include certain "designated areas," including the District of Columbia, its "environs" (such as the City of Alexandria), and various portions of New York, San Francisco, and New Jersey. See USPP Gen. Ors. 2101.02(B)–(F) (ECF #12-1, Ex. 2).

later to the midnight shift in the same district, where he worked until November 2017.[2] Every year of his employment, Vinyard completed refresher training courses on permissible uses of force and other law enforcement techniques. *See generally* Vinyard Qualification Cards (Ex. D). At the time he shot Ghaisar, Vinyard held a current qualification rating for his issued firearm. *See id.* at 2; *see also* E-mail from Deputy Chief Gregory T. Monahan, United States Park Police, to Agent Giulio Arseni (January 10, 2018, 1:10 p.m.) (Monahan E-mail) (Ex. E) (identifying the serial number of Vinyard's weapon).

### C.      The Death of Bijan Ghaisar

Shortly after 7:20 p.m. on November 17, 2017, 25-year-old Bijan Ghaisar was rear-ended by an Uber driver just south of Marina Drive on the George Washington Parkway.[3] Dep't. of Interior Investigator's Traffic Crash Report (Crash Report) (Ex. F). Rather than exchange information with the other driver, Ghaisar continued to drive. Summary of Interview with Atif Rehman (Ex. G) at 2. The Uber driver's passenger called 911 to report the accident, advising the operator that the other car involved was a Jeep Cherokee with the license plate "BIJAN." *Id.* The 911 operator directed the report to the Park Police.

At approximately 7:32 p.m., Park Police dispatchers requested area officers look out for the Jeep.[4] Summary Presentation (Ex. N) at 5:10–36. Minutes later, Officers Vinyard and Amaya

---

[2] Over the course of Vinyard's career, two individuals launched complaints against him for excessive force, racial bias, and discourteous conduct; he was eventually exonerated from these charges. See United States Park Police Internal Affairs August 2012 Report (Ex. B) (excessive force complaint investigation); United States Park Police Office of Professional Responsibility August 2013 Report (Ex. C) (rude/discourteous conduct and racial bias investigation).

[3] The Uber driver received a citation for failure to maintain proper control of his vehicle. Crash Report at 1. The citation was later dismissed.

[4] Dispatch's initial description incorrectly stated that Ghaisar's Jeep was the striking vehicle. It corrected its report within minutes. Summary Presentation at 7:01–7:27.

located Ghasiar's vehicle and began pursuit.[5] Summary Presentation at 7:30–42; see also 8:56–9:17. Vinyard drove the cruiser and Amaya principally communicated with dispatch. Amaya relayed that they were driving at "49 miles per hour" and described traffic on the Parkway as "light," with "clear" road conditions. Summary Presentation at 9:01–07. Fairfax County Police Department Lieutenant Daniel Gohn joined the pursuit shortly after and captured much of the incident on the in-car video recorder mounted on his dashboard. Summary Presentation at 9:52–55; Dashcam Video at 19:38:11–14.[6] The footage captures three encounters between the officers and Ghaisar.[7]

### 1.    The Parkway Stop

At approximately 7:38 p.m., Ghaisar's Jeep slowed to a halt. Summary Presentation at 10:01–02; Dashcam Video at 19:38:18–21. Contrary to federal law enforcement training—which instructs officers to park *behind* a stopped vehicle to "[e]hance[] illumination" and "provide[] protection from traffic," FLETC Training Directorate (Ex. H) at 11—Vinyard instead pulled the cruiser *in front* of Ghaisar's Jeep. Summary Presentation at 10:01–02; Dashcam Video at 19:38:18–21. Amaya then exited the cruiser from the passenger side, immediately drew his firearm, and advanced.[8] Summary Presentation at 10:02–04; Dashcam Video at 19:38:21–23.

---

[5] Contrary to Vinyard's recitation of the facts, see Vinyard Br. 6, dispatch did not offer an explicit instruction to pursue. Rather, dispatch asked if the officers were "in pursuit." See Summary Presentation at 8:22–24 (Dispatch: "Are you in pursuit of this vehicle?").

[6] The Summary Presentation's time stamps differ from those presented on the dashboard camera's video. For the Court's convenience, the brief contains parallel citations throughout.

[7] In his motion, Vinyard suggests that the officers first encountered Ghaisar on the George Washington Parkway "just before the exit for Bell Haven Road." Vinyard Br. 7. He cites no evidence and submits no affidavit describing any previous encounters.

[8] Amaya's immediate display of his firearm is inconsistent with Park Police General Orders. See USPP Gen. Ors. 3601.02(D) (prohibiting displays of a firearm unless "a degree of imminent danger exists" & 3601.04(E) (requiring officers to "immediately notify his/her supervisor by radio or other available means" for firearm displays) (Ex. I). It is also inconsistent

With his weapon in his right hand, Amaya grabbed for the driver's side door handle with his left as Vinyard rounded the back of the cruiser. Summary Presentation at 10:06–07; Dashcam Video at 19:38:24–26. After trying (and failing) to open the door, Amaya smashed the butt of his gun against the Jeep's rear driver's side window as Ghaisar drove away. Summary Presentation at 10:06–07; Dashcam Video at 19:38:24–25. Fairfax's Lieutenant Gohn took over the pursuit while Vinyard and Amaya reentered Vinyard's cruiser. Summary Presentation at 10:10; Dashcam Video at 19:38:30. The Park Police officers resumed the lead shortly thereafter. Summary Presentation at 11:17; Dashcam Video at 19:39:35.

### 2. The West Boulevard Stop

A few seconds after the Park Police officers resumed the principal pursuit position, Ghaisar signaled a right turn off the George Washington Parkway and onto West Boulevard. Summary Presentation at 11:36–45; Dashcam Video at 19:39:55–40:03. Despite leaving their primary jurisdiction on the Parkway and entering the Fairfax County Police Department's jurisdiction, Vinyard and Amaya retained control over the pursuit.[9]

Contrary to his training, see p. 4, *supra*, Vinyard stopped his cruiser in front of the Jeep. Summary Presentation at 11:53; Dashcam Video at 19:40:12. Yet again, Amaya immediately

---

with Vinyard's recitation of the facts, in which he claims that Amaya only "approached the Jeep" after "Mr. Ghaisar failed to respond." Vinyard Br. 8.

[9] In his motion to dismiss, Vinyard asserts "Virginia law and the Park Police General Order on vehicular pursuits authorized Of[ficer] Vinyard to continue the pursuit." Vinyard Br. 9. Vinyard's assertion is inconsistent with both Virginia law and the Park Police General Order. The Virginia Code allows officers "in close pursuit" of a person suspected of "committ[ing] *a felony*" to continue into the Commonwealth. Va. Code Ann. § 19.2-79. Vinyard cites nothing to establish that he suspected Ghaisar of committing a felony; on the contrary, failure of a driver to stop following an accident is often a misdemeanor, see Va. Code Ann. § 46.2-894(ii). Additional circumstances must be met to render the conduct felonious. See Va. Code Ann. § 46.2-894(i). The Park Police General Order, moreover, explicitly provides that "[a]s soon as practical, the pursuit *shall* be relinquished to police units of the entered jurisdiction." USPP Gen. Or. 2205.04(B)(4) (emphasis added).

displayed his firearm (contravening Park Police policy) as the officers exited the cruiser and approached Ghaisar's car.[10] Summary Presentation at 11:54–56; Dashcam Video at 19:40:13–15. Amaya again tried to open the Jeep's door. *Id.* And when his efforts proved futile, Amaya kicked the rear quarter panel of the Jeep as Ghaisar drove away. Summary Presentation at 11:56; Dashcam Video at 19:40:15. The officers returned to the cruiser and resumed the pursuit.

###   3.        The Alexandria Avenue Stop

At approximately 7:41 p.m., the Jeep turned westbound onto Alexandria Avenue as the officers followed. Summary Presentation at 11:59–12:03; Dashcam Video at 19:40:18–22. The cars passed Officer Bryant Hartzell of the Fairfax County Police Department, who at the time was attempting to deploy stop sticks to deflate the Jeep's tires and bring the chase to an end. Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15. The Jeep eventually stopped at the stop sign at the intersection of Alexandria Avenue and Fort Hunt Road. Summary Presentation at 12:59–13:01; Dashcam Video at 19:41:18–20.

Vinyard again drove his cruiser in front of Ghaisar's Jeep. Summary Presentation at 13:02–07; Dashcam Video at 19:41:21–26. This time, however, Vinyard created a roadblock by turning the cruiser's passenger side almost perpendicular to the front of the Jeep so Ghaisar could not pass.[11] Summary Presentation at 13:02–07; Dashcam Video at 19:41:21–26.

Weapon in hand, Amaya exited the front passenger seat of the cruiser and confronted Ghaisar at gunpoint for the third time. Summary Presentation at 13:10–13; Dashcam Video at

---

[10] See note 8, *supra*.

[11] Under Park Police General Order 2210, a "stationary roadblock" is defined as a barricade—including a vehicle—used "to close a roadway ahead of a pursuit." USPP Gen. Or. 2210.03(B) (Ex. J). They are to be used only as "a last resort" to effectuate "the immediate apprehension of a fleeing suspect." *Id.* at 2210.01. To perform a roadblock, an officer must obtain authorization from their supervisor. *Id.* Officer Vinyard did not seek, nor obtain, the required permission.

19:41:29–31. Amaya slowly worked his way to his right, toward the driver's window. Summary Presentation at 13:10–14; Dashcam Video at 19:41:29–32. The Jeep inched forward. Summary Presentation at 13:14; Dashcam Video at 19:41:32. Amaya fired a shot through the windshield of the Jeep and the vehicle stopped. Summary Presentation at 13:14; Dashcam Video at 19:41:33. In fractions of a second, the brake lights disengaged, Summary Presentation at 13:15; Dashcam Video at 19:41:34, and Amaya fired three more rounds through the windshield, Summary Presentation at 13:16–17; Dashcam Video at 19:41:34–35.

Simultaneously, Vinyard walked around the back of the cruiser, drew his firearm, and fired his first shot at Ghaisar through the driver's window. Summary Presentation at 13:16; Dashcam Video at 19:41:35. The brakes lights reignited, Summary Presentation at 13:17; Dashcam Video at 19:41:36, only to dim again as the car began to creep right, Summary Presentation at 13:22–24, Dashcam Video at 19:41:40–43. Vinyard shot two additional rounds in rapid succession. Summary Presentation at 13:25, Dashcam Video at 19:41:43. The car stopped,[12] Summary Presentation at 13:26–37; Dashcam Video at 19:41:43–55, and both officers fired another round as the car began to roll off the road, Summary Presentation at 13:37–39; Dashcam Video at 19:41:56–57. Vinyard fired one final shot as the car careened into a ditch on its right. Summary Presentation at 13:40; Dashcam Video at 19:41:59.

### 4.    Aftermath

Once Ghaisar's Jeep fell off the road, Vinyard, Amaya, and the Fairfax County Police Department performed a security sweep to check the car for additional occupants. Summary Presentation at 13:45–end; Dashcam Video 19:42:04–end. Finding none, they began to render

---

[12] At this point, Officer Hartzell appears on the video. Summary Presentation at 13:25; Dashcam Video at 19:41:44. Later, Fairfax County Police Officer Daniel Gohn is also visible. Summary Presentation at 14:10; Dashcam Video at 19:42:28.

aid to Ghaisar. *Id.* Emergency Medical Services eventually pulled Ghaisar from his car and transported him to Inova Fairfax Hospital, where he succumbed to his injuries ten days later. All told, Vinyard and Amaya each fired five shots. FBI Laboratory Report (Ex. K); see also Monahan E-mail. Ghaisar sustained five gunshot wounds: four to his head and one to his wrist. Medical Examiner Report (Ex. L) at 3. The medical examiner report listed homicide as the cause of death. *Id.* at 5.

## II.    Procedural Background

Even before Ghaisar died, the Federal Bureau of Investigation began investigating the shooting at the request of the United States Park Police Chief. Over the course of two years, the FBI interviewed over 150 witnesses.[13] Ultimately, the Department of Justice declined to prosecute the officers under 18 U.S.C. § 242 because the Department concluded there was "insufficient evidence to establish beyond a reasonable doubt that the officers *willfully* committed a violation of 18 U.S.C. § 242."[14] Press Release, United States Attorney's Office for the District of Columbia, Federal Officials Close Investigation Into the Death of Bijan Ghaisar (Nov. 14, 2019), https://www.justice.gov/usao-dc/pr/federal-officials-close-investigation-death-bijan-ghaisar (emphasis added).

---

[13] After months of refusing to grant authorization to allow federal agents to freely speak with the Commonwealth, the Department of Justice recently reconsidered that position and has now authorized Department personnel to communicate with the Commonwealth's Attorney and to share all appropriate information and evidence consistent with the Department's *Touhy* obligations. Because the Commonwealth only recently received materials from the Department, it has not yet had an opportunity to review everything. Additional evidence may, therefore, be uncovered.

[14] To secure a criminal conviction under Section 242, the Department must establish three elements: (1) the defendant acted "under color of" law; (2) the defendant acted "willfully"; and (3) the defendant deprived the victim of rights under the Constitution or federal law or subjected them to different punishments on account of a protected characteristic. See *Screws v. United States*, 325 U.S. 91 (1945); cf. Va. Code Ann. § 18.2-36 (involuntary manslaughter), Part I(B), *infra*.

On October 15, 2020, a Fairfax special grand jury returned indictments against both officers on two state criminal counts: (a) involuntary manslaughter for "feloniously kill[ing] and slay[ing]" Ghaisar in violation of Virginia Code § 18.2-36; and (b) reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1). ECF #1-1; see also ECF #2. On November 16, 2020, Vinyard filed a notice of removal under 28 U.S.C. §§ 1442 and 1455. ECF #1. This Court accepted jurisdiction on April 23, 2021. ECF #2. Both defendants now move to dismiss the indictments against them on the basis of Supremacy Clause immunity.[15]

## LEGAL STANDARD

Vinyard raises his Supremacy Clause immunity defense by way of a motion to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(1). This provision allows a defendant to raise by pretrial motion "any defense . . . that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "In such circumstances, the district court may grant the motion only if the facts supporting the immunity claim are not in dispute." *Idaho v. Horiuchi*, 253 F.3d 359, 367 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011) ("[A] district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts."). The evidence is viewed in the light most favorable to the non-moving party. *Horiuchi*, 253 F.3d at 367 ("In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts."); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 752 (6th Cir. 1988).

---

[15] Officer Amaya is represented by different counsel in a separate case. See *Commonwealth of Virginia v. Amaya*, No. 1:21-cr-00091-CMH (E.D. Va.).

Vinyard himself recognizes that, if he establishes a threshold defense of immunity, the State's burden is merely to raise "a genuine factual issue" as to whether Vinyard did "no more than what was necessary and proper for him to do in the performance of his duties." Vinyard Br. 18 (quoting *Tanella*, 374 F.3d at 148); Vinyard Br. 22 (framing the issue as whether the Commonwealth can "raise any genuine factual dispute as to whether Of[ficer] Vinyard's pursuit of Mr. Ghaisar, or even his use of deadly force, fell within his duties as a Park Police Officer"); see also *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8 (1906) (rejecting Supremacy Clause immunity when "there was a conflict of evidence as to whether [the victim] had or had not surrendered, and it is conceded that if he had, it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law"); *Horiuchi*, 253 F.3d at 366 n.9 ("*Drury* actually holds . . . [that e]ven if it is *not* clear that the federal agents acted unlawfully, the state may proceed with the prosecution if it has evidence which, if believed, would render the federal agents' conduct unlawful.").

## ARGUMENT

The Supremacy Clause declares: "This Constitution, and the Laws of the United States . . .  shall be the supreme Law of the Land . . . , any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. This clause ensures that states do not "retard," "impede," "burden," or "control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. 316, 317 (1819).

The Supremacy Clause can protect a federal officer from state prosecutions, but such protection is reserved for "exceptional" circumstances. *Baker v. Grice*, 169 U.S. 284, 291 (1898) ("Unless [a] case be of such an exceptional nature, [courts] ought not to encourage the interference of the federal court below with the regular course of justice in the state court."); see also *Birsch v. Tumbleson*, 31 F.2d 811, 814 (4th Cir. 1929) (explaining that the cases finding

immunity before trial involved "*emergencies*" and were "*unusual* in that they present[ed] considerations which would not ordinarily arise, and in which the propriety of the acts of the federal officers was beyond question . . .") (emphasis added); accord *Morgan v. California*, 743 F.2d 728, 731 (9th Cir. 1984) ("The power of the federal court to enjoin state criminal prosecutions . . . should be sparingly exercised."). "Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Colorado v. Symes*, 286 U.S. 510, 518 (1932).

Supremacy Clause immunity is available only if a defendant establishes: (1) he was performing an act which he was authorized to do by federal law; and (2) in so doing, he did "*no more* than what was necessary and proper for him to do." *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) (emphasis added). The purpose of this test is to identify the extraordinary cases where a State's prosecution will "nullify[] federal laws by attempting to impede enforcement of those laws." *Morgan*, 743 F.2d at 731 (citing *Neagle*, 135 U.S. 1); see also *McCulloch*, 17 U.S. at 317.[16] Reserving Supremacy Clause immunity for such cases of "an exceptional nature," *Baker*, 169 U.S. at 291, accounts for the reality that Supremacy Clause immunity undermines the States' "pre-eminent[]" power "to make and enforce [their] own criminal laws," *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981). See also *State v. Ivory*, 906 F.2d 999, 1002 (4th Cir. 1990).

Vinyard has failed to show that every reasonable trier of fact would conclude that (1) Vinyard was performing an act which he was authorized to do by federal law; and (2) Vinyard's actions were "*no more* than what was necessary and proper for him to do." *Neagle*, 135 U.S. at 75 (emphasis added).

---

[16] Accord *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 6–7 (1906) (discussing *Neagle*, and explaining that the circumstances of *Neagle* were "peculiar" and "extraordinary," and that the case was decided on "exceptional facts").

**I.    Vinyard is not entitled to Supremacy Clause immunity because a reasonable trier of fact could conclude that Vinyard's actions were not authorized by federal law**

There is a genuine dispute as to whether Vinyard acted within his authority when he pursued and killed Ghaisar. "For a federal official to be exempt from civil or criminal liability under state law," it is well-settled that "it is not enough that . . . he was present for an official purpose." *Isaac v. Googe*, 284 F. 269, 270 (5th Cir. 1922); see also *Symes*, 286 U.S. at 518.[17] Rather, to be entitled to Supremacy Clause immunity, Vinyard must show that killing Ghaisar was "an act which he was authorized to do" by federal law. *Neagle*, 135 U.S. at 75; *Isaac*, 284 F. at 270 (noting actions must be "done in pursuance of his official duty"). The relevant question is, therefore, whether there is a genuine dispute as to whether Vinyard exceeded this authority when he pursued, confronted, and killed Ghaisar. Vinyard fails the authorization prong of Supremacy Clause immunity twice: *first,* because his actions were outside the statutory authority of a Park Police officer; and *second*, because an officer per se lacks authority when they violate the Constitution or act with criminal intent.

**A.    Vinyard's actions were inconsistent with federal law and Park Police policy**

Contrary to Vinyard's representations (Vinyard Br. 20–21), his authority as a Park Police officer to initiate (and continue) a vehicular pursuit, conduct a warrantless arrest, establish a roadblock, and use deadly force is greatly constrained by both the department's internal policies and state and federal law. In pursuing and killing Ghaisar, Vinyard well-exceeded that authority.

*Vinyard exceeded his pursuit authority*. Contrary to Vinyard's assertions, the Park Police General Order on vehicular pursuits does not authorize the actions Vinyard took, and neither

---

[17] As one of the cases on which Vinyard himself relies (Vinyard Br. 23) explained, "[c]ertainly it cannot be said that any federal official is absolutely immune merely because of his official standing and his official purpose." *Petition of McShane*, 235 F. Supp. 262, 273 (N.D. Miss. 1964).

does Virginia law. Under Park Police policy, "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense." USPP Gen. Or. 2205.01. Vehicular pursuits are authorized only when an officer believes (or has reason to believe) a *felony* has occurred or when "[t]he suspect presents a clear and immediate threat to public safety if not immediately apprehended." USPP Gen. Or. 2205.01; see also Vinyard Br. 20–21. The same follows under Virginia law. See Va. Code § 19.2-79 (emphasizing that law enforcement who "enters this Commonwealth in close pursuit" can follow a fleeing suspect "on the grounds that he has committed a felony"). But when Vinyard initiated the pursuit,[18] it was far from clear that Ghaisar had committed any felony. See Va. Code Ann. § 46.2-894 (violation of statute imposing duty to stop following accident is a "Class 5 felony" only if the accident "results in injury to or the death of any person, or if the accident results in more than $1,000 of damage"); see also note 9, *supra*.[19] And whether Ghaisar

_____

[18] Vinyard asserts that his pursuit was authorized because it was initiated by dispatch and his supervisors did not order him to stop. Vinyard Br. 21. Neither assertion justifies his conduct. As a factual matter, dispatch did not actually *instruct* Vinyard to initiate the pursuit. Compare Vinyard Br. 6 ("In this case, Of[ficer] Vinyard did not initiate the pursuit, but was instructed to do so by dispatch") with Summary Presentation at 8:22–23 (Dispatch asking (not instructing): "Are you in pursuit of this vehicle?"). Furthermore, under the General Order, the decision to initiate a pursuit must be based "on the *pursuing officer's* conclusion that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large." USPP Gen. Or. 2205.04(A)(2) (emphasis added). But if the "necessity of an immediate apprehension" does not outweigh "the level of danger created by the pursuit," *id.* at 2205.01, it "may be terminated" by *either* the pursuing officer *or* the officer's supervisor "at any time." *Id.* at 2205.04(A)(5). This is especially true where, as here, the supervisor may not have had enough information to make an informed decision, see Expert Report of Dr. Christopher Chapman (Expert Report) (Ex. M) at 185, and "[t]he suspect's identity ha[d] been established and the need for immediate apprehension is no longer present," USPP Gen. Or. 2205.04(A)(4)(b). Vinyard's supervisors' failure to intervene does not excuse—let alone authorize—Vinyard's pursuit outside of Park Police jurisdiction. Vinyard's attempt to distance himself from the decision to initiate and continue the pursuit is not supported by the evidence.

[19] In fact, Amaya acknowledges that the officers "did not have information about the extent of damage to either car" and consequently did not know "whether the crime was a felony or misdemeanor" under Virginia Code § 46.2-894. See *Amaya*, No. 1:21-cr-00091-CMH (ECF #8) at 5. Throughout the pursuit, the only charge the officers advised dispatch of was "fleeing

presented a threat to public safety, too, was less than clear at the time Vinyard initiated the pursuit. See Expert Report at 106, 151 (noting Vinyard's actions were inconsistent with viewing Ghaisar as a threat).

Even if the pursuit had been justified at the outset, continuing it off the George Washington Parkway was not. Under the Park Police General Orders, vehicular pursuits are only authorized in "areas of primary Force jurisdiction." USPP Gen. Or. 2205.01. When they extend outside of these locations, officers must "relinquish[] [the pursuit] to police units of the entered jurisdiction" "[a]s soon as practical." *Id.* at 2205.04(B)(4).

Vinyard nevertheless continued to pursue Ghaisar well into a residential neighborhood outside of the Park Police's primary jurisdiction and into the Fairfax County Police Department's domain. See, *e.g.*, Summary Presentation at 11:36–45; Dashcam Video at 19:39:55–40:03 (pursuit continuing onto West Boulevard). Vinyard's refusal to relinquish control is particularly unreasonable because: (i) the officers had affirmatively requested assistance from the Fairfax County Police Department, and (ii) members of that unit were actively attempting to render aid. See, *e.g.*, Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15 (showing Officer Hartzell attempting to deploy stop sticks on Alexandria Avenue). Vinyard's actions thus exceeded his pursuit authority.

*Vinyard exceeded his statutory arrest authority*. Vinyard claims he had the authority to "pursue and arrest Mr. Ghaisar" outside of his primary jurisdiction. Vinyard Br. 8–9. The facts, however, do not support his arrest authority.

---

from the scene of an accident." See Summary Presentation 9:07–17 (Dispatch: "U.S. Park Police, what's going to be your charges, just the accident?" Officers: "Uh, Park Police, ten-four, it's going to be fleeing from the scene of an accident at this point.").

Park Police officers' power to make warrantless arrests is limited. Park Police may make warrantless arrests only "within the [National Park] System" or outside of the system when the arrestee "is fleeing from the System to avoid arrest" for "any offense *against the United States* committed in the presence of [an] officer" or "any *felony* cognizable under the laws of the United States." 54 U.S.C. § 102701(a)(2)(B) (emphases added). Construing the facts in the light favorable to the Commonwealth, none of these circumstances were present here.

First, Vinyard lacked authority to arrest because (at the very least) there is a dispute as to whether Ghaisar was fleeing to *avoid* arrest. Because the shooting occurred off the Parkway, outside of the National Park System, Vinyard only had authorization to arrest Ghaisar under federal law if he was "fleeing . . . *to avoid arrest.*" 54 U.S.C. § 102701(a)(2)(B) (emphasis added); see also *United States v. Allen*, No. 17-po-7135, 2018 WL 1035770, *4 (D. Md. Feb. 23, 2018) (recognizing Park Police officer "lacked the statutory authority" to arrest the defendant off the Baltimore-Washington Parkway because he was "not fleeing from the officer"); *United States v. Hernandez-Ayala*, No. 16-po-4622, 2017 WL 2666243, *3 (D. Md. June 21, 2017) (same). This provision requires that "a defendant have knowledge that he is being pursued by police and a resultant intention to evade arrest." *United States v. Jones*, 428 F. Supp. 2d 497, 500–01 (W.D. Va. 2006);[20] see also *United States v. LaFountain*, No. 12-po-6164, 2013 WL 391153, *2 (D. Mass. Jan. 29, 2013). Vinyard sets forth no argument—much less evidence—that § 102701(a)(2)(B)'s intent requirement was met here. In fact, "[a] reasonable person placed in Mr. Ghaisar's position would have reasonably been alarmed and/or fearful when Officer Vinyard was paralleling and heading off their vehicle." Expert Report at 107 (parenthetical omitted).

---

[20] *Jones* discusses 16 U.S.C. § 1a-6(b), Section 102701's predecessor. The condition that Park Police may only perform warrantless arrests "provided such arrests occur within th[e National Park] system or the person to be arrested is fleeing therefrom to avoid arrest" remains substantively unchanged. 428 F. Supp. 2d at 500 (quoting 16 U.S.C. § 1a-6(b)).

Whether Ghaisar had the intent to evade arrest (or was fleeing because he was in fear) is a genuine issue that not only defeats Vinyard's statutory authority but also his motion to dismiss.

Second, there was no "offense against the United States" or "felony cognizable under the laws of the United States." 54 U.S.C. § 102701(a)(2)(B). Vinyard identifies a state law—leaving the scene of a vehicle collision in violation of Virginia Code § 46.2-894—as the basis for his purported arrest authority. See Vinyard Br. 6. Because Virginia Code § 46.2-894 is a *state law*, not federal law, it is not a felony "against the United States." 54 U.S.C. § 102701(a)(2)(B). Furthermore, Vinyard offers nothing to explain how Ghaisar's suspected violation of Virginia Code § 46.2-894 rose to the level of a felony. Again, violation of this statute is often a misdemeanor. See note 9 & p. 14, *supra*.[21] The accident precipitating Vinyard's pursuit of Ghaisar—wherein an Uber rear-ended Ghaisar's vehicle—did not result in the death of any person, and Vinyard neither alleges nor introduces any evidence that he had reason to conclude that the accident resulted in more than $1,000 of damage to property. Even if the accident resulted in more than $1,000 of damage to property to bring it within the ambit of a potential felony, flight from such an accident poses no risk of harm in the normal course and is instead one of the crime's requirements. See Va. Code Ann. § 46.2-894. Construing the facts in the light

---

[21] Even under Virginia law, Vinyard's authority to arrest is limited to felony offenses. Va. Code Ann. § 19.2-79 (emphasizing that law enforcement who "enters this Commonwealth in close pursuit" can arrest a fleeing suspect "on the grounds that he has committed a felony"). Vinyard's arrest authority fares no better under other provisions of the Virginia Code. Although Park Police officers are authorized to act as "conservator[s] of the peace," see Va. Code Ann. § 19.2-12, they only have the power to conduct a warrantless arrest in particular circumstances, see Va. Code Ann. § 19.2-18. These include when officers have "reasonable grounds or probable cause to suspect [a person] of having committed a *felony* not in his presence," or "for an alleged misdemeanor not committed in his presence when the officer receives a radio message from his department or other law-enforcement agency within the Commonwealth *that a warrant or capias for such offense is on file*." Va. Code Ann. §§ 19.2-18; 19.2-81(B) & (F)  (emphases added). Vinyard is not entitled to the presumption that there was a felony here, and he was not acting pursuant to any warrant or capias.

favorable to the Commonwealth, Vinyard is not entitled to a presumption that any potential violation of Virginia Code § 46.2-894 was a felony.

*Vinyard did not have authority to initiate a roadblock.* Vinyard also exceeded his authority by initiating a roadblock without proper authorization. Park Police policy is clear that "[s]tationary roadblock[s]"—such the police cruiser Vinyard used here—may be used only as "a last resort" to "close a roadway ahead of a pursuit." USPP Gen. Ors. 2210.01 & 2210.03(B). What is more, Park Police officers must obtain permission from a supervisor before erecting such a roadblock. *Id.* at 2210.01. Vinyard, however, never obtained that required permission. See Summary Presentation at 13:02–07; Dashcam Video at 19:41:21–26. Vinyard plainly exceeded his authority, both because he neglected to obtain authorization from a supervisor and because he utilized a tool of "last resort" despite ample alternates available to him. See Part II(C), *infra*.

*Vinyard exceeded any authorization to use force.* The limited circumstances permitting Park Police officers to use deadly force are not present here, either. Park Police officers are instructed "to employ only the minimum level of force necessary to control a situation." USPP Gen. Or. 3615.02 (ECF #12-1, Ex. 3). Use of deadly force is "only justified" if the individual "committed a felony" involving "the infliction or threatened infliction of serious physical injury or death" and their escape "would pose an imminent threat of serious physical harm." *Id.* at 3615.03(C)(2).

Here again, Vinyard exceeded his authority. Vinyard bases his use of deadly force on "a *possible* Class 5 felony under V.A. Code § 46.2-894," Vinyard Br. 6 (emphasis added), which is tenuous at best because violation of this statute is often a misdemeanor, see, *e.g.*, note 9, pp. 14, 16–17, *supra*. And Vinyard's contention that he suspected Ghaisar of "committ[ing] several felonies and misdemeanors," as well as "traffic offenses," Vinyard Br. 8, fares no better, because

unspecified suspicions of wrongdoing cannot justify the use of deadly force. See Part I(B), *infra* (discussing the Fourth Amendment's prohibition on unreasonable seizures). Construing the facts in the light favorable to the Commonwealth, Ghaisar's alleged violation of Code § 46.2-894 (or any other "traffic offense[]") did not satisfy the conditions necessary to justify the use of deadly force. See USPP Gen. Or. 3615.03(C)(2).

Merely being a federal officer does not exempt Vinyard from "criminal liability for what he does beyond the scope of his official duties." *Isaac*, 284 F. at 270. Even if Vinyard pursued Ghaisar "for an official purpose," to be immune, the act for which he seeks immunity "must be done in pursuance of his official duty." *Id.* Without probable cause to arrest Ghaisar for any federal offense, 54 U.S.C. § 102701, or felony, see, *e.g.*, Va. Code Ann. § 19.2-79, Vinyard's actions of chasing, shooting, and killing Ghaisar were not in pursuance of Vinyard's official federal duty. *Drury*, 200 U.S. at 8; *Isaac*, 284 F. at 270. At the very least, there is a genuine dispute as to whether Vinyard exceeded his authority.

> **B.   Vinyard's authority did not extend to violations of the Constitution and to actions taken with criminal intent**

An officer necessarily exceeds the scope of his authority when he violates federal constitutional law or acts with a culpable mens rea in violating state law. "[A] federal officer's actions . . . fail to qualify as 'necessary and proper' if committed in violation of the negative injunctions of the Constitution." *Denson v. United States*, 574 F.3d 1318, 1347 (11th Cir. 2009). Likewise, "[a] federal agent may lose his *Neagle* protection if he acts out of personal interest, malice, or with actual criminal intent." *Maryland v. DeShields*, 829 F.2d 1121, *6 (4th Cir. 1987) (table). A violation of either, therefore, is sufficient to doom Vinyard's immunity claim.

1.      Vinyard exceeded the scope of his federal duties by violating Ghaisar's Fourth Amendment rights. When federal officers act contrary to their constitutional mandate, they are

not immune from state prosecution. *Neagle*, 135 U.S. at 81. A Fourth Amendment violation, therefore, is necessarily fatal to a Supremacy Clause immunity claim. The Fourth Amendment "guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting U.S. Const. amend. IV). The Fourth Amendment's bar on unreasonable seizures prohibits the use of excessive force by a police officer in effectuating an arrest. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 1550 (2020). To determine whether an officer's use of force is excessive, courts apply a "standard of objective reasonableness." *Id.* (citation omitted).[22] "Because the 'intrusiveness of a seizure by means of deadly force is unmatched,' a police officer may use deadly force only if the officer has 'probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (citations omitted).

Vinyard claims he was attempting to arrest Ghaisar for "a possible Class 5 felony" under Virginia Code § 46.2-894.[23] Vinyard Br. 6. Notably, Vinyard introduces no evidence to support this representation, and it is well established that "statements by counsel in briefs or in court are not evidence." *United States ex rel. Bradshaw v. Alldredge*, 432 F.2d 1248, 1248 n.1 (3d Cir. 1970); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) ("counsel's statements [a]re not evidence in the case" (internal quotation marks omitted)). What is more,

---

[22] The Fourth Amendment inquiry is thus similar to the second part of the test the Second Circuit laid out in *Tanella* which looks at whether the federal official's beliefs were objectively unreasonable, see Part II(C), *infra*.

Although a holding that a federal official violated a victim's Fourth Amendment rights is *sufficient* to defeat both prongs of the *Neagle* inquiry—because a federal official's actions violating the Fourth Amendment cannot be authorized by federal law and because a federal official's actions violating the Fourth Amendment are, by definition, not objectively reasonable—a holding that a federal official violated a victim's Fourth Amendment rights is not *necessary* to defeat Supremacy Clause immunity.

[23] See note 9, pp. 14, 16–18, *supra*, discussing that violations of Code § 46.2-894 are felonies only in limited circumstances.

even if Vinyard is correct that he had reason to believe that Ghaisar was a fleeing felon, that alone cannot justify deadly force. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable"). When "the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so" because "[i]t is not better that all felony suspects die than that they escape." *Id.*; see also *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) ("Indeed, an officer may reasonably apply deadly force to a fleeing suspect—even someone suspected of committing a serious felony—only if the officer has 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" (quoting *Garner*, 471 U.S. at 3)). At the very least, there is a genuine dispute as to whether Vinyard's conduct violated the Fourth Amendment.

2.      Vinyard's criminal culpability also means he necessarily exceeded his federal authority. When officers act "wantonly, with a criminal intent," they cannot also "act[ ] within the scope of the authority conferred by the laws of the United States." *In re Fair*, 100 F. 149, 155 (C.C.D. Neb. 1900); *Symes*, 286 U.S. at 518 ("While homicide that is excusable or justifiable may be committed by an officer in the proper discharge of his duty, murder or other criminal killing may not."); *DeShields*, 829 F.2d at *6.

Vinyard was indicted by the special grand jury on two counts: reckless discharge of a firearm in violation of Virginia Code § 18.2-56.1(A1) and involuntary manslaughter in violation of Virginia Code § 18.2-36. ECF #1-1; see also ECF #2. The indictments allege that Vinyard "handle[d] a firearm in a manner so gross, wanton, and culpable as to show a reckless disregard for human life," ECF #1-1 at 2 (charging Vinyard with reckless handling of a firearm in violation

20

of Code § 18.2-56.1), and, in so doing, Vinyard "did feloniously kill and slay Bijan Caesar

Ghaisar," *id.* at 1 (charging Vinyard with involuntary manslaughter in violation of Code § 18.2-

36). Under Virginia law, this means Vinyard discharged his firearm with a "conscious[]

disregard of [Ghaisar's] rights," or with "reckless indifference" to the harm that "would probably

result." Mathew Bender & Company, Inc., Virginia Model Jury Instructions – Civil: Release 20,

March 2020, Instruction No. 4.040, (last accessed July 15, 2021, 11:30 a.m.) http://www.courts

.state.va.us/courts/circuit/resources/model_jury_instructions_civil.pdf (defining "willful and

wanton" conduct); see also *Sotnikau v. Lynch*, 846 F.3d 731, 736 (4th Cir. 2017).

If Vinyard exhibited culpable recklessness in his use of his firearm, that is sufficient to

strip him of Supremacy Clause immunity. At this point, a reasonable fact finder could find that

he did. Vinyard and Amaya fired on the Jeep as the car began to roll off the road. Summary

Presentation at 13:38; Dashcam Video at 19:41:57. Even as it fell, Vinyard fired a final,

unnecessary shot. Summary Presentation at 13:39; Dashcam Video at 19:41:58; accord Expert

Report at 13 (opining that Vinyard "cutting in front of Mr. Ghaisar's vehicle" was "consistent

with personalization of the incident"); *id.* at 181 (suggesting Vinyard's last shots were "as a

result of becoming emotionally involved in the incident, perceiving that Mr. Ghaisar was

engaging in 'contempt of cop'"). Viewing the evidence in the light most favorable to the

Commonwealth and assuming the truth of the allegations in the indictment, *Horiuchi*, 253 F.3d

at 367, there is at least a genuine dispute as to whether Vinyard acted with sufficiently culpable

mens rea.

*        *        *

Because there are genuine issues of fact as to whether Vinyard's pursuit and killing of

Ghairsar were in pursuance of any federal duty, Vinyard is not entitled to immunity from state

prosecution at the Rule 12 stage. See *Morgan*, 743 F.2d at 734 (denying habeas relief based on Supremacy Clause immunity when evidence raised dispute over whether federal drug enforcement agents acted in pursuit of official duties); *see also Birsch*, 31 F.2d at 816 (affirming district court's denial of writ of habeas corpus to a federal game warden charged in state court with homicide after killing two poachers because evidence was conflicting as to who fired first). His motion should be denied.

## II.    Vinyard is not immune because he failed to eliminate any genuine dispute that, in pursuing and killing Ghaisar, his actions were no more than necessary and proper in performing his federal duties

The Supreme Court has made clear that a federal official is not entitled to Supremacy Clause immunity unless "he did no more than what was necessary and proper for him to do." *Neagle*, 135 U.S. at 75. Some courts describe the "necessary and proper" standard as containing "two conditions" that "must be satisfied": "(1) the actor must subjectively believe that his action is justified; *and* (2) that belief must be objectively reasonable." *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) (emphasis added); *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (citations omitted), *cert denied* 138 S. Ct. 642 (2018); accord *Horiuchi*, 253 F.3d at 366 n.11 ("[T]he test is both objective and subjective: The officer is denied immunity unless he demonstrates that he believed both reasonably *and* honestly that his conduct was lawful.").[24] This court, however, need not consider these conditions because it is clear that Vinyard's actions were neither "necessary" nor "proper" under any formulation.

_____

[24] It is unclear whether the subjective prong remains a valid part of the Supremacy Clause immunity analysis. In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court rejected the subjective prong of the qualified immunity defense and held that qualified immunity requires only a showing that the official's conduct was objectively reasonable. Various lower courts have expressed doubt about whether the subjective prong of the Supremacy Clause analysis survives *Harlow*. See, *e.g.*, *Horiuchi*, 253 F.3d at 365 n.7; *Wyoming v. Livingston*, 443 F.3d 1211, 1222 (10th Cir. 2006).

As an initial matter, the Commonwealth's evidence—at the very least—creates a genuine issue of fact that, by pursuing and killing Ghaisar, Vinyard did more than was necessary and proper to perform his federal duties. If he lacked authority to take the actions he took, see Part I(A), *supra*, they were not "proper." If ready alternatives would have allowed him to fulfill his law enforcement duties in a less fatal way, his actions were hardly "necessary." See Part II(A) & (C), *infra*. And in any event, Vinyard failed to eliminate any genuine dispute under the *Tanella* test. The Commonwealth's evidence creates a genuine issue as to whether Vinyard believed his actions were justified, see Part II(B), *infra*, and whether any subjective belief was objectively reasonable, see Part II(C), *infra*.[25] Vinyard, therefore, is not entitled to immunity.

**A.  Vinyard's actions exceeded what was necessary and proper**

At the very least, there is a genuine dispute as to whether Vinyard's actions exceeded what was necessary and proper. As to what was proper, Vinyard engaged in numerous actions that conflicted with Park Police policy and his training. See Part I(A), *supra*. Surpassing the scope of his statutory and regulatory authority automatically renders Vinyard's actions improper. See *Horiuchi*, 253 F.3d at 366 n.10 ("There are, of course, numerous ways a federal officer might abuse his authority . . . [f]or instance, an agent may not torture a kidnapper to reveal the whereabouts of his victim, even though he believes it necessary to perform his job."). That in and of itself is sufficient to defeat his motion. *Neagle*, 135 U.S. at 75 (requiring that actions must be both necessary *and* proper).

---

[25] Rather than include evidence to support the arguments in his motion, Vinyard asserts that "[i]f the Commonwealth claims any factual dispute exists, Of[ficer] Vinyard will produce relevant evidence in his reply, or at the evidentiary hearing." Vinyard Br. 3, n.1. Just as he cannot raise arguments for the first time in a reply brief, Vinyard should not be permitted to withhold evidence only to later include it in his reply. This subverts the briefing process by negating the Commonwealth's ability to respond to or address the evidence in Vinyard's brief.

As to what was necessary, the existence of alternatives to killing Ghaisar severely undermines Vinyard's contention that his actions were "no more" than what was required. As the expert report stresses, there were multiple reasonable alternatives available to the officers, rendering the use of deadly force unreasonable. See Expert Report at 106, 122, 139, 151–52, 177, 181. For one thing, Vinyard could have terminated the pursuit on his own accord. See USPP Gen. Or. 2205.04(4)(b) (noting that "the decision to terminate a pursuit by the officer" is sometimes "the most prudent course of action," particularly where, as was the case here, "[t]he suspect's identity [was] established" and the "need for immediate apprehension" was not present); see also Expert Report at 177, 181. For another, stop sticks could have deflated Ghaisar's tires and ended the encounter. Summary Presentation at 12:53–56; Dashcam Video at 19:41:11–19:41:15 (showing Fairfax County Police Department attempting to deploy stop sticks); see also Expert Report at 139, 152. Or, if the pursuit *had* to continue, Vinyard could have ceded control to Fairfax County or allowed one of the two helicopters circulating the area to follow Ghaisar from the sky. Expert Report at 139, 151. The pursuit did not have to reach such a tragic conclusion.

Bijan Ghaisar is dead in part because Vinyard chose to confront Ghaisar through dangerous and unnecessary means, despite other available options. Construing the facts in the light most favorable to the Commonwealth, Vinyard's actions were far more than what was necessary and proper.

### B. A reasonable trier of fact could disagree with Vinyard's unsupported suggestion that he had a subjective belief that Ghaisar posed a risk to officers or the public

Vinyard's motion fails under the two-part *Tanella* framework. As an initial matter, Vinyard never asserts he actually had a subjective belief that Ghaisar posed a risk to officers or the public, much less introduces any evidence that he had such a belief. The closest he comes is

24

stating—without substantiating—that there was "no reason to believe" he "acted out of personal interest or bore any ill will towards Mr. Ghaisar." Vinyard Br. 25. But Vinyard cannot support this subjective belief with legal memorandum alone. *Alldredge*, 432 F.2d at 1248 n.1 ("statements by counsel in briefs or in court are not evidence"); *Martin*, 48 F.3d at 1358 ("counsel's statements [a]re not evidence in the case" (internal quotation marks omitted)).[26]

The cases on which Vinyard relies demonstrate that federal officials can—and indeed, must—demonstrate their subjective belief through affidavits, declarations, live testimony, and the like. For example, in *Texas v. Kleinert*, Officer Kleinert testified as to his subjective belief before the district court. See 855 F.3d at 317–18. Similarly, in *Tanella*, the district court relied on grand jury testimony to demonstrate the officer's subjective belief. See 374 F.3d at 150. This is true in the various cases Vinyard cites. See, *e.g.*, *Arizona v. Files*, 36 F. Supp. 3d 873, 879, 884 (D. Ariz. 2014) (emphasizing gaps in Files's testimony at an evidentiary hearing); *Petition of McShane*, 235 F. Supp. 262, 275 (N.D. Miss. 1964) (federal official supported his representations with an affidavit, and court relied on the "uncontradicted portions of [the federal official's] own affidavit"). Vinyard's failure to do anything to substantiate his subjective belief eliminates his Supremacy Clause immunity defense under the *Tanella* test.

### C. Even if Vinyard subjectively believed his actions were justified, a reasonable trier of fact could find that belief objectively unreasonable

Even if Vinyard were to offer evidence that he subjectively believed his actions at the time were justified, a reasonable fact finder could find that belief was objectively unreasonable in light of Vinyard's training.

---

[26] See also *Ging v. Ging*, 18 Neb. App. 145, 150, 775 N.W.2d 479, 484 (2009) ("of course, statements of counsel in a brief are not evidence"); accord *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982) ("a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda").

*Training and policy*. The mismatch between Vinyard's training and his actions undermine any argument that it was objectively reasonable for him to believe his actions were justified. As the Supreme Court has explained in the qualified immunity context, "whether it was objectively legally reasonable to conclude that a given [action] was supported by [law] will often require examination of the information possessed by the [acting] officials." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). And "it may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers . . . they had been warned." *Gutierrez v. San Antonio*, 139 F.3d 441, 449 (5th Cir. 1998).[27] When he joined the Park Police, Vinyard trained at the Federal Law Enforcement Training Center for months, see page 2, *supra*, and represents that he graduated "first in his class," Vinyard Br. 3. On the day he shot Ghaisar, Vinyard held a current qualification for his issued firearm and had completed refresher training on law enforcement use of force standards. Vinyard Qualification Cards at 5. And yet, Vinyard's response to Ghaisar's situation was grossly inconsistent with that training. See Part I(A), *supra*. Vinyard exercised power reserved for the most extreme and pressing circumstances to arrest an individual suspected of committing a non-violent misdemeanor. Vinyard's training and certifications alone defeat any suggestion that he

---

[27] This is consistent with numerous federal courts of appeal that have likewise concluded that the training an officer receives is a relevant consideration when evaluating the reasonableness of his use of force. See, *e.g.*, *Martin v. Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013) (concluding officers had violated clearly established law when their training "alerted them to the potential danger of [a] particular type of excessive force" (internal quotations and citation omitted)); *Drummond ex rel. Drummond v. Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) ("Anaheim's training materials are relevant not only to whether the force employed in this case was objectively unreasonable, but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable." (internal citation omitted)); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[T]he reasonableness of an officer's actions must be assessed in light of the officer's training.").

could have believed that his actions were justified despite their departure from policy, let alone that his barely asserted belief was objectively reasonable.

*Numerous alternatives.* Finally, the existence of alternative means to apprehend Ghaisar for a hit-and-run undermines the objective reasonableness of Vinyard's asserted subjective belief. See also Part II(A), *supra*. As the Park Police General Order on vehicle pursuits stresses, if the "necessity of an immediate apprehension" does not outweigh "the level of danger created by the pursuit," the pursuit "may be terminated at any time." USPP Gen. Ors. 2205.01 & 2205.04(A)(5). Indeed, it advises that "the decision to terminate a pursuit by the officer" is sometimes "the most prudent course of action," particularly where, as was the case here, "[t]he suspect's identity [was] established" and the "need for immediate apprehension" was not present. *Id.* at 2205.04(A)(4)(b); see also Expert Report at 177–78 (noting "[a]n additional reasonable alternative to Officer Vinyard approaching Mr. Ghaisar's vehicle and discharging his firearm" would have been to follow up with Ghaisar at a later time "because the identity of Mr. Ghaisar was reasonably known").

Moreover, the fact that "the immediate apprehension of a fleeing suspect" was not "essential to minimize danger to the public" makes Vinyard's decision to engage in a "stationary roadblock"—by parking his car immediately in front of Ghaisar's—all the more unreasonable. USPP Gen. Or. 2210.01; see also Part I(A), *supra*; accord Expert Report at 151–52 (noting Vinyard should have employed the "High Risk Operations Protocol" because "heading off" Ghaisar "would be objectively unreasonable and more than what would be reasonably necessary and proper to seize" him). Park Police policy is clear that "stationary roadblocks" are to be used only as "a last resort" to "close a roadway ahead of a pursuit." USPP Gen. Ors. 2210 & 2210.03(B). Vinyard nevertheless intentionally drove his cruiser in front of Ghaisar's vehicle—

27

not once, but three times, all despite training and warnings to the contrary.[28] See, *e.g.*, Summary Presentation at 10:01–02; Dashcam Video at 19:38:18–22 (stop one); Summary Presentation at 11:53; Dashcam Video at 19:40:12 (stop two); Summary Presentation at 13:02–07; Dashcam Video at 19:41:21–26 (stop three). Indeed, Amaya was "directly in front of the Jeep, and in-between the two vehicles" during the final stop *because* of Vinyard's roadblock. Vinyard Br. 11.

Viewing this evidence in the light most favorable to the Commonwealth, a reasonable trier or fact could conclude that Vinyard's asserted belief was not objectively reasonable. *Horiuchi*, 253 F.3d at 367 ("In determining whether material facts are in dispute, the district court must give the non-moving party the benefit of all doubts, both as to the basic facts and the inferences to be drawn from those facts."); *Livingston*, 443 F.3d at 1226; *Tanella*, 374 F.3d at 148. At the very least, these facts support a genuine dispute.

\*   \*   \*

As the Ninth Circuit explained, "Supremacy Clause immunity is not absolute and . . . presupposes that federal agents *can* be prosecuted for violating state law." *Horiuchi*, 253 F.2d at 376 (emphasis added). Instead, Supremacy Clause immunity is reserved for the "exceptional" case where the propriety of the officer's actions is "beyond dispute." *Id*. at 368; accord *United States v. Weaver*, 659 F.3d 353, 355 n.\* (4th Cir. 2011). This is no such case.

The Supremacy Clause has never contemplated immunity from state charges for federal officers who kill outside the scope of their federal authority. And if such an immunity were available, in no event would such officers be immune where they exceeded the scope of (and acted contrary to) their federal duties. Based on the evidence, a reasonable fact finder could conclude that Vinyard's actions exceeded the scope of his authority and any subjective belief that

---

[28] See page 4, *supra*.

his actions were justified was objectively unreasonable. At the very least, there are material

questions of fact in dispute which, if resolved against Vinyard, would strip him of Supremacy

Clause immunity.

## CONCLUSION

Like anyone else indicted on state charges, Vinyard should face trial. Vinyard's motion

should be denied.

Respectfully submitted,

By:     */s/ Michelle S. Kallen*
              Michelle S. Kallen (VSB No. 93286)
              *Acting Solicitor General*

Mark R. Herring (VSB No. 31718)
  *Attorney General*

Erin B. Ashwell (VSB No. 79538)
  *Chief Deputy Attorney General*

Steve T. Descano (VSB No. 89881)
  *Commonwealth's Attorney for Fairfax
  County*

Kyle Manikas (VSB No. 71234)
  *Chief Deputy Commonwealth's Attorney*

Matthew B. Lowery (VSB No. 41662)
  *Deputy Commonwealth's Attorney*

Kendall T. Burchard (VSB No. 95710)
  *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

29

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2021, a true and accurate copy of this paper was filed

electronically with the Court's CM/ECF system, which will then send a notification of such

filing to the parties, including:

>     Daniel S. Crowley
>     HANNON LAW GROUP, LLP
>     333 8th Street NE
>     Washington, DC 20002
>     dcrowley@hannonlawgroup.com

>      */s/ Michelle S. Kallen*
>     Michelle S. Kallen (VSB No. 93286)
>     *Acting Solicitor General*
>     Office of the Attorney General
>     202 North Ninth Street
>     Richmond, Virginia 23219
>     (804) 786-7240 – Telephone
>     (804) 371-0200 – Facsimile
>     solicitorgeneral@oag.state.va.us